UNITED STATES DISTRICT COURT
                      DISTRICT OF MASSACHUSETTS

_____
                                    )
AER ADVISORS INC., WILLIAM J.       )
DEUTSCH, and PETER E. DEUTSCH,      )
                                    )
               Plaintiffs,          )
                                    )      Civil Action
v.                                  )      No. 17-12214-PBS
                                    )
FIDELITY BROKERAGE SERVICES LLC,    )
                                    )
               Defendant.           )
_____)


                        **MEMORANDUM AND ORDER**

                           August 22, 2018

Saris, C.J.

                           **INTRODUCTION**

     Plaintiffs AER Advisors Inc. ("AER"), William J. Deutsch, and Peter E. Deutsch bring this action against Fidelity Brokerage Services LLC ("Fidelity"), alleging that its unauthorized lending of the Deutsches' shares in China Medical Technologies Inc. ("China Medical"), caused a market disruption in June 2012. To cover up its role in the market disruption, Fidelity allegedly implicated Plaintiffs in a false Suspicious Activity Report ("SAR"), filed with the government. As a result of the SAR, Plaintiffs claim they were subject to investigations by various state and federal securities-related agencies.

                                 1

On November 8, 2017, the United States District Court for the Southern District of Florida ordered that the case be transferred to this Court. See Docket No. 40. One month later, Plaintiffs filed their Second Amended Complaint ("SAC") (Docket No. 64), asserting 13 causes of action, all of which are primarily based on the SAR. The claims are for negligent reporting (Counts I and II), tortious interference with existing business relationships (Count III), tortious interference with prospective business relationships (Count IV), breach of contract and the covenant of good faith and fair dealing (Counts V and VI), promissory estoppel (Count VII), breach of fiduciary duty (Count VIII), unjust enrichment (Count IX), negligence or gross negligence (Count X), deceptive and unfair trade practices (Counts XI and XII), and prima facie tort (Count XIII).

Fidelity moved to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), arguing first that it enjoys absolute immunity from liability for any SAR filed. Second, Fidelity maintains that any claims predicated on its alleged unlawful lending of the Deutsches' shares must be dismissed under the doctrine of claim preclusion. Finally, Fidelity argues that AER's claim for tortious interference with existing business relationships is barred by the statute of limitations.

After a hearing, the Court **ALLOWS** Fidelity's motion to dismiss (Docket No. 66).

**FACTUAL BACKGROUND**

The following factual background comes from Plaintiffs' SAC. Plaintiffs' factual allegations must be accepted as true at this stage of the litigation. See Foley v. Wells Fargo Bank, N.A., 772 F.3d 63, 71 (1st Cir. 2014).

## I. The Parties

AER, a registered investment advisor, served clients nationwide with "discretionary investment management services." SAC ¶ 17. AER joined Fidelity's Wealth Central platform in 2009 and exclusively relied on that platform to provide its investment services to clients. SAC ¶¶ 18-19. Fidelity promised to assist AER with business development and growth. SAC ¶ 21. In reliance on that promise, AER actively solicited business from clients nationwide. SAC ¶ 21. In 2011, AER introduced the "China Gold" investment strategy and decided to make the strategy the focus of its business model. SAC ¶¶ 22, 111. The China Gold strategy was based on the expectation that the anomalously low prices at which some Chinese securities were trading would "trigger a management buy-out or another privately driven exit transaction (e.g., a strategic acquisition)." SAC ¶ 22. Fidelity supported China Gold and incorporated the strategy into its own investing. SAC ¶ 23.

William Deutsch is the Chairman of Deutsch Family Wine & Spirits, and Peter Deutsch serves as the company's Chief

Executive Officer. SAC ¶¶ 8-9. The Deutsches were clients of Fidelity's Family Office Services ("FFOS"), and eventually participated in AER's China Gold strategy. SAC ¶¶ 25-26. When Peter Deutsch decided to join FFOS in November 2011, he accepted Fidelity's service proposal, which offered him "seamless and flawless" strategy execution, institutional-quality brokerage services, and a "client first," "conflict-free environment." SAC ¶¶ 27-28. Peter Deutsch relied on Fidelity's promises about the services it would provide. SAC ¶ 28.

**II.   The China Medical Investment and Market Disruption**

After Peter Deutsch joined FFOS, the Deutsches decided to accumulate a large number of shares of China Medical, gain control of the company, and sell it to a buyer or private equity firm. See SAC ¶¶ 29-30. Peter Deutsch began acquiring China Medical shares through his FFOS account in December 2011. SAC ¶ 33. By February 28, 2012, the Deutsches owned nearly 4.4 million shares of the company. SAC ¶ 34. They had purchased around 8.6 million additional shares by June 30, 2012. SAC ¶ 34.

Fidelity emailed AER on March 5, 2012, with an offer for the Deutsches to join its "fully paid lending program" for their China Medical shares. SAC ¶ 35. In the email, Fidelity represented that its "securities lending desk in Capital Markets [was] paying a 5% rate . . . for these hard to borrow shares." SAC ¶ 35. The email also acknowledged that there was "a 100%

requirement to hold this position" and that a "service agreement [would] need to be signed by the end client to enter into this program." SAC ¶ 35. If the Deutsches had accepted Fidelity's offer, they would have been in a good position to accomplish a short squeeze.[1] See SAC ¶ 36. However, AER replied to Fidelity's offer with a straightforward rejection: "Client is not interested in lending stock." SAC ¶ 37. After receiving AER's email, Fidelity never advised the Deutsches that they should move their shares and trade in a cash account, as required by Fidelity's internal policy. SAC ¶ 39.

Despite the fact that Fidelity had not received consent to lend, between May and early June of 2012, the company lent nearly 1.8 million of the Deutsches' China Medical shares to short sellers or their brokers. SAC ¶ 41. Fidelity made money from these loans, but the Deutsches were not notified of the lending, were not paid any compensation for the loans, and did not receive any collateral. SAC ¶ 42. When AER asked Fidelity whether it had lent the Deutsches' stock without their

---

[1] A "short squeeze" is a "situation when prices of a stock . . . start to move up sharply and many traders with short positions are forced to buy stocks . . . to cover their positions and prevent losses. This sudden surge of buying leads to even higher prices." Tello v. Dean Witter Reynolds, Inc., 410 F.3d 1275, 1277 n.3 (11th Cir. 2005) (quoting John Downes & Jordan Elliot Goodman, Barron's Finance & Investment Handbook 807 (6th ed. 2003)), abrogated on other grounds, 559 U.S. 633 (2010).

5

authorization, Fidelity responded that it could not disclose that information. See SAC ¶ 49. Peter Deutsch was also told by Amanda Topping at FFOS that the portion of China Medical stocks that Fidelity could lend out from his account was "very small." SAC ¶ 50.

    The wine turned to vinegar in June 2012. On June 11, 2012, after "a routine monthly transfer of [China Medical] shares between the Deutsches' margin accounts," Fidelity's lending triggered a recall obligation. SAC ¶¶ 45-46. The company then issued a recall for about 1.5 million shares on June 13, 2012, eventually recalling approximately 1.8 million shares over the next few days. SAC ¶ 46. The Senior Vice President and head of the Securities Lending Desk of Fidelity Capital Markets, Ugyen Sass, anticipated a short squeeze due to the company's loans and failed recalls on June 15, 2012. SAC ¶ 46. Then, on June 18, 2012, Fidelity issued its final batch of recalls. SAC ¶ 46. Because the recalls failed, Fidelity bought roughly 1.2 million shares of China Medical on the open market between June 19 and June 27, 2012. SAC ¶ 46. The price of the stock increased from $4.00 per share on June 13, 2012, to $11.80 per share on June 29, 2012. SAC ¶ 46.

On June 29, 2012, the Securities and Exchange Commission ("SEC") halted the trading of China Medical. See SAC ¶ 46.[2]

## III. **The SAR and the January 2013 Letter**

Fidelity filed a SAR on July 5, 2012. SAC ¶ 56. A SAR is the document a "broker or dealer in securities" files with the Financial Crimes Enforcement Network ("FinCEN"), to report "any suspicious transaction relevant to a possible violation of law or regulation." 31 C.F.R. § 1023.320(a)(1), (b)(1). The internal draft SAR reports that Fidelity observed suspicious activity in the Deutsches' and AER's accounts, "which ha[d] the appearance of attempting to influence a short squeeze in the stock of China Medical." Docket No. 64-2 at 3; SAC ¶ 56. The draft SAR also states:

> On June 18, 2012, 11,945,520 shares of China Medical (from five separate Deutsch accounts) were journaled from type 2 (margin), to type 1 (cash). . . . The result of this action caused previously loaned out shares to be recalled, and since they were not delivered, stock loan had to execute buy-in transactions.

Docket No. 64-2 at 4; SAC ¶ 57. Plaintiffs believe that this draft SAR reflects the contents of the SAR Fidelity actually filed. SAC ¶ 56.

---

[2] Although the SAC states that trading was halted on July 29, 2012, the record suggests that trading was actually halted on June 29, 2012. See SAC ¶ 79 (alleging that the SEC lifted the trading halt on July 16, 2012); see also Docket No. 64-2 at 3 n.1 (noting that the SEC suspended trading from "6/29/2012 . . . through 07/13/2012").

7

Plaintiffs allege that the transfers between the Deutsches' accounts did not result in the recall of a single share of China Medical. SAC ¶ 60. Based on this fact, Plaintiffs allege that there was no possibility that they had orchestrated the short squeeze. SAC ¶¶ 58-59. Moreover, they allege that Fidelity knew that Plaintiffs did not initiate the short squeeze -- even though the SAR accused them of it -- because Fidelity issued the recalls for the shares it had loaned. SAC ¶¶ 59-64. The SAC alleges that the SAR was simply a smokescreen intended to disguise the fact that Fidelity's unlawful lending had truly triggered the short squeeze. See, e.g., SAC ¶ 59.

To cover up the SAR, Fidelity hid documents throughout an extended Financial Industry Regulatory Authority ("FINRA") arbitration. SAC ¶¶ 84-85. Only after the United States District Court for the Southern District of New York ordered documents to be produced on May 6, 2015 did Plaintiffs learn of Fidelity's internal draft of the SAR. See SAC ¶ 96.

After the SAR was filed, Fidelity attempted to "poach" AER's clients. SAC ¶ 114. "[I]n or around January 2013," Fidelity sent letters to AER's existing clients, which stated that the two companies no longer had a relationship and that Fidelity was no longer accepting instruction from AER on any accounts. SAC ¶ 114. The letter also gave clients options for managing their Fidelity accounts going forward. SAC ¶ 114.

## IV. Investigations and Damages

As a result of the SAR filing, AER was investigated by the SEC and required to attend a five-hour interview. SAC ¶¶ 99-101. Ultimately, the SEC decided not to pursue an enforcement action against AER. SAC ¶ 102. Both the Florida Office of Financial Regulation, Division of Securities, and New Hampshire's Bureau of Securities Regulation also investigated AER's actions, but neither pursued enforcement. SAC ¶¶ 103-06. AER spent hundreds of thousands of dollars on these investigations and "could not, and did not economically recover." SAC ¶¶ 106, 115.

The SEC also investigated Peter Deutsch's trading activities related to China Medical. SAC ¶¶ 107-08. He was required to attend an interview with the SEC, which focused on whether he "intended to artificially manipulate the market through moving his shares from margin to cash." SAC ¶ 108. The SEC did not pursue an enforcement action, but Peter Deutsch expended hundreds of thousands of dollars on the investigation, suffered emotional distress, and had his attention diverted from his business activities. SAC ¶¶ 109-10.

## DISCUSSION

## I. Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, the factual allegations in a complaint must "state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678

9

(2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678 (citing Twombly, 550 U.S. at 556). In evaluating the sufficiency of a complaint, a court "may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'" Ocasio-Hernández v. Fortuño-Burset, 640 F.3d 1, 12 (1st Cir. 2011) (quoting Twombly, 550 U.S. at 556).

In some circumstances, affirmative defenses may form the basis of a motion to dismiss for failure to state a claim. See Blackstone Realty LLC v. F.D.I.C., 244 F.3d 193, 197 (1st Cir. 2001). When a motion to dismiss is "premised on the inevitable success of an affirmative defense," the court must still look to the allegations in the plaintiff's complaint, as it does when considering any Rule 12(b)(6) motion. Nisselson v. Lernout, 469 F.3d 143, 150 (1st Cir. 2006). Dismissal is only appropriate when "(i) the facts establishing the defense are definitively ascertainable from the complaint and the other allowable sources of information, and (ii) those facts suffice to establish the affirmative defense with certitude." Id. (quoting Rodi v. S. New England Sch. of Law, 389 F.3d 5, 12 (1st Cir. 2004)).

## II. Fidelity's Immunity Under 31 U.S.C. § 5318(g)(3)

Congress has granted financial institutions immunity from liability for filing SARs. See 31 U.S.C. § 5318(g)(3)(A). The statute granting immunity reads:

> Any financial institution that makes a voluntary disclosure of any possible violation of law or regulation to a government agency . . . shall not be liable to any person under any law or regulation of the United States, any constitution, law, or regulation of any State or political subdivision of any State, or under any contract or other legally enforceable agreement (including any arbitration agreement), for such disclosure . . . .

Id. The scope of this statutory immunity varies from circuit to circuit, however. Compare Stoutt v. Banco Popular de Puerto Rico, 320 F.3d 26, 30-32 (1st Cir. 2003) (declining to read good faith requirement into statute), and Lee v. Bankers Trust Co., 166 F.3d 540, 544-45 (2d Cir. 1999) (same), with Lopez v. First Union Nat'l Bank of Fla., 129 F.3d 1186, 1192-93 (11th Cir. 1997) (holding that immunity applies when financial institution has "good faith suspicion that a law or regulation may have been violated").

Plaintiffs urge the Court to apply the Eleventh Circuit's good faith limitation to Fidelity's immunity defense because this case was transferred from a Florida federal court. See Docket No. 72 at 10-13; Docket No. 77 at 6-7. When questions of federal law must be decided, the transferee court will apply the

law of its own circuit. See Murphy v. F.D.I.C., 208 F.3d 959, 966 (11th Cir. 2000) ("Since the federal courts are all interpreting the same federal law, uniformity does not require that transferee courts defer to the law of the transferor circuit."); Island View Residential Treatment Ctr., Inc. v. Bluecross Blueshield of Mass., Inc., Civ. No. 07-10581-DPW, 2007 WL 4589335, at *9 (D. Mass. Dec. 28, 2007). This general rule applies with equal force where a transferee court is considering a federal statutory defense in a diversity case. The Court therefore will apply the First Circuit's interpretation of 31 U.S.C. § 5318(g)(3) in Stoutt.

The First Circuit has expressly rejected the idea of an implicit good faith requirement in § 5318(g)(3). See Stoutt, 320 F.3d at 30. And it has done so in sweeping language, indicating that the statute grants absolute immunity from suit, even when disclosures are fabricated or made with malice. See id. at 33. In the opinion, the First Circuit reasoned that Congress did not intend to include a good faith qualification to immunity because (1) it easily could have written the requirement into the statute; (2) it removed a good faith requirement from an earlier draft of the provision; and (3) any limitation on immunity would discourage disclosure. See id. at 31-32. Thus, the First Circuit concluded that § 5318(g)(3) immunizes financial institutions whose SAR disclosures are "wilfully [sic] false" or "unfounded,

12

incomplete, careless and even malicious." Id. at 32 (internal quotation marks omitted).

Plaintiffs, however, focus on the fact that § 5318(g)(3) only grants financial institutions immunity when they report "any possible violation of law or regulation." See Docket No. 72 at 7-10; Docket No. 77 at 1-3. They claim that while Fidelity allegedly reported the Deutsches for market manipulation in the form of an illegal short squeeze, SAC ¶ 56, the Deutsches' activities could not possibly have caused the short squeeze, see Docket No. 72 at 8-10; Docket No. 77 at 3. Plaintiffs specifically point to paragraphs 45 through 47 and 60 through 64 in the SAC to show that Fidelity knew the Deutsches could not possibly be responsible for the market disruption because Fidelity itself had caused it. See Docket No. 91 at 41:21-42:5. Since Fidelity was not reporting an actual "possible violation of law," according to Plaintiffs, the conclusion follows that Fidelity has not met the threshold requirement for immunity. But in light of Stoutt, the Court is not persuaded by this argument or by the state court cases Plaintiffs cite in their briefing.

Stoutt deals specifically with the "any possible violation" language. In that case, Banco Popular reported the plaintiff to the FBI for check kiting, or "knowingly writing a check against an account with insufficient funds," which can be a federal offense. Stoutt, 320 F.3d at 28. The First Circuit noted that

13

the bank's report "was cast as the disclosure of a possible case of bank fraud, assuredly a possible violation of law." Id. at 30 (emphasis added). But the plaintiff said that the bank knew he was innocent all along because he had informed a bank official of his transactions and "was encouraged to draw on uncollected funds." Id. at 29, 32. In assessing the bank's motion for summary judgment, the First Circuit explained:

> Conceivably, Stoutt could argue that the report was not one of a possible violation, even though so termed and colorably disclosing a possible crime, if the Bank knew that there was (in reality) no violation. But this is a non-literal reading of the statute, which speaks of "any possible violation," and we think it more straightforward to confront any requirement of good faith or due care as an implied qualification of immunity rather than an issue of initial scope. Here, whatever its internal beliefs, the Bank did by any objective test identify a "possible violation."

Id. at 30.

Plaintiffs allege that Fidelity's SAR accused them of manipulating stock prices by orchestrating an illegal short squeeze. SAC ¶ 56. Based on Plaintiffs' own allegations, the SAR, on its face, "was cast" as a disclosure of a possible violation of securities law. Accordingly, Fidelity's SAR met the "possible violation" threshold for § 5318(g)(3) immunity.

Finally, Plaintiffs make an additional argument that fraudulent SARs intended to misdirect suspicion do not insulate financial institutions from civil liability. See Docket No. 72

14

at 3-7; Docket No. 77 at 3-6. This argument does not make it past Stoutt either. In its analysis, the First Circuit considered but discounted the fact that plaintiffs like Stoutt "could be left without any civil redress against malicious or wholly unfounded accusations." Id. at 31. Despite that reality, the court said that government authorities can filter out SARs reporting "false charges" and decide not to pursue those investigations. Id. at 32. The First Circuit also concluded that criminal law -- including 18 U.S.C. § 1517, which prohibits obstructing an examination of a financial institution -- was a means of remedying "wilfully [sic] false reports" by those financial institutions. Id. Stoutt therefore contemplated that a bank might falsely point blame at others to cover up its own wrongdoing and decided that civil immunity should still attach to the filing of that fraudulent SAR.

To the extent Counts I through XIII are founded on the alleged SAR, they are dismissed.

### III. Claim Preclusion Based on FINRA Arbitration Award

Fidelity argues that Counts VI, VIII, IX, XI, XII, and XIII must be dismissed under the claim preclusion doctrine because they are based in part on the alleged unlawful lending of the Deutsches' China Medical stock. See Docket No. 67 at 12-15. According to Fidelity, the FINRA arbitration award resolved all

of the Deutsches' unlawful lending claims and precludes their re-litigation here. See Docket No. 67 at 13-14.

The Court need not decide whether applying the claim preclusion doctrine would be appropriate in this case. On two occasions, Plaintiffs have expressly disavowed that any of their claims in the SAC are premised on unlawful lending and have reiterated that all claims are based on the SAR. See Docket No. 72 at 16 ("While claims in the Arbitration were predicated on the unlawful lending of the Deutsches' [China Medical] shares, the Second Amended Complaint asserts claims predicated on Fidelity's fraudulent cover-up scheme and SAR Referral."); Docket No. 77 at 10 n.10 ("The six counts Fidelity identified as [relating to unlawful lending] are expressly predicated on Fidelity's 'fraudulent scheme' including the filing of a bogus SAR . . . ."). According to Plaintiffs, the facts about unlawful lending are included only to provide "background or context to a different set of claims (those arising from Fidelity's bogus SAR and fraudulent cover-up scheme)." Docket No. 72 at 17 (emphasis in original).

Because Plaintiffs have disclaimed unlawful lending and reaffirmed the SAR as their foundation for all asserted claims, the Court does not decide the claim preclusion issue. The Court dismisses Counts VI, VIII, IX, XI, XII, and XIII in their

entirety, on the ground that Fidelity enjoys absolute immunity for its SAR filing.

## IV. AER's Tortious Interference with Existing Business Relationships Claim (Count III)

The only count that remains to be discussed is Count III, AER's claim for tortious interference with existing business relationships. To succeed on this tort claim, a plaintiff must prove that (1) "a business relationship . . . of economic benefit" existed; (2) the defendant knew of that relationship; (3) the defendant intentionally and maliciously interfered with that relationship; and (4) the plaintiff suffered a "loss of advantage" as a direct result of the defendant's conduct. Comey v. Hill, 438 N.E.2d 811, 816 (Mass. 1982).[3]

The tortious interference claim is based in part on letters Fidelity sent to AER's existing clients in or around January 2013, which explained that Fidelity had terminated its relationship with AER and included options for clients to consider going forward. See Docket No. 64 ¶¶ 114, 132-39. Plaintiffs allege that these letters were attempts to "poach" AER's clients. Docket No. 64 ¶ 114. Fidelity has moved to dismiss Count III on multiple grounds, including that the

---

[3] Under Florida law, the elements of the tort are very similar. See Int'l Sales & Serv., Inc. v. Austral Insulated Prods., Inc., 262 F.3d 1152, 1154 (11th Cir. 2001).

tortious interference claim is time-barred. See Docket No. 67 at 15-17.

Plaintiffs' position is that the letters are "intertwined with the SAR" and are "actually part and parcel of the entire fraudulent scheme by Fidelity which related to the SAR referral." Docket No. 91 at 46:5-18. They maintain that the discovery of the existence of the SAR in 2015 should count as the date of accrual because malicious intent was not clear until that time. Maybe so, but allowing AER to use the SAR to show bad intent as a basis for Fidelity's liability would violate 31 U.S.C. § 5318(g)(3). Again, to the extent Count III is based on the SAR or the discovery of its existence, Fidelity is immune from liability, even if the claim is timely.

If the Court were to focus solely on the January 2013 letters themselves, the tortious interference claim would be time-barred under the three-year Massachusetts statute of limitations, as AER's attorneys concede. See Docket No. 91 at 46:19-47:4; see also Mass. Gen. Laws ch. 260, § 2A; Pagliuca v. City of Boston, 626 N.E.2d 625, 628 (Mass. App. Ct. 1994). Moreover, even if the Court were to apply Florida's four-year statute of limitations, see Fla. Stat. § 95.11(3)(o); Primerica Fin. Servs., Inc. v. Mitchell, 48 F. Supp. 2d 1363, 1368 (S.D. Fla. 1999), Plaintiffs' complaint would still be time-barred, as it was originally filed on July 7, 2017 -- approximately four

and a half years after the letters were sent. Accordingly, the Court need not engage in a choice-of-law analysis to determine which state's law actually applies. Count III is dismissed.

## **ORDER**

For the foregoing reasons, the Court **ALLOWS** Fidelity's motion to dismiss (Docket No. 66).

/s/ PATTI B. SARIS
Patti B. Saris
Chief United States District Judge